DU PAGE COUNTY AIRPORT AUTHORITY, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellants.—DU PAGE COUNTY AIRPORT AUTHORITY, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellants (Du Page County Board of Review *et al.*, Defendants).

Second District    Nos. 2—04—0769, 2—04—0770 cons.

Opinion filed June 15, 2005.—Rehearing denied July 20, 2005.

Joseph E. Birkett, State's Attorney, of Wheaton (Lisa A. Hoffman and Robert G. Rybica, Assistant State's Attorneys, of counsel), for appellant Du Page County Board of Review.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Diane M. Potts, Assistant Attorney General, of counsel), for appellant Department of Revenue.

Kenneth M. Florey and Joanne H. Petty, both of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for other appellants.

Phillip A. Luetkehans and Brian J. Armstrong, both of Schirott & Luetkehans, P.C., of Itasca, for appellee.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Defendants the Department of Revenue (Department), Brian A. Hamer (in his official capacity as director of the Department), Du Page County Board of Review, West Chicago Elementary School District No. 33, City of West Chicago, West Chicago High School District No. 94, West Chicago Park District, West Chicago Fire Protection District, and West Chicago Library District appeal the decision of the circuit court of Du Page County reversing the decision of the Department and ruling that certain property belonging to plaintiff, the Du Page County Airport Authority, fulfills an airport authority purpose and is thus tax exempt. For the reasons that follow, we reverse the decision of the circuit court of Du Page County and affirm the ruling of the Department.

## I. FACTS

The parties stipulated to the relevant facts, which we briefly recite here. Plaintiff is an airport authority created pursuant to the Airport Authorities Act (Act) (70 ILCS 5/1 *et seq.* (West 2000)). By virtue of the authority granted it under the Act, plaintiff owns, operates, and maintains the Du Page Airport (Airport), a general aviation airport, and owns property leased to various tenants, including private, for-profit, commercial entities, all on approximately 2,800 acres of land in West Chicago, Illinois. As a general aviation airport, the Airport accommodates a mix of air traffic ranging from single-engine, propeller-driven aircraft and helicopters to large, high-performance jets. There are no commercial carriers using any of the Airport's facilities. In real estate tax year 2000, plaintiff's maximum real estate tax rate by statute was 0.0306, and the actual tax rate for plaintiff's real estate tax levy was 0.0291.

This appeal involves 65 tax parcels, which plaintiff claims are exempt under section 15—160 of the Property Tax Code (Code) (35 ILCS 200/15—160 (West 2000)) as fulfilling an "Airport Authority purpose." The parties have grouped the 65 parcels generally into six groups.

.

The first group of contested parcels comprises the land for the Prairie Landing Golf Club (Golf Course Property). The Golf Course Property contains a 21-hole public golf course and appurtenant facilities, such as an 18,600-square-foot clubhouse, a maintenance building, and a pump house. The clubhouse consists of a golf shop; restaurant; bar; locker rooms; and banquet facilities for private parties, weddings, and business meetings. In the year 2000, the golf course charged $90 per round of golf (including use of a golf cart).

Plaintiff owns the golf course and appurtenant facilities. For tax year 2000, the golf course was maintained and operated by a private, for-profit management company, Meadowbrook Golf Group, Inc. (Meadowbrook), pursuant to a management agreement. The annual management fee was $85,000 plus bonus payments based on the revenue generated by the golf course. Meadowbrook also maintained and operated the clubhouse, pro shop, restaurant, and banquet hall. Except for parcels containing portions of a runway, a heliport, landing guidance lights, and a clear zone for the runway, there are no aviation or aeronautic activities occurring on the Golf Course Property. Though plaintiff did not itself maintain or operate the golf course or its facilities, but instead did so through its agent, Meadowbrook, the Golf Course Property serves as a revenue source for plaintiff.

The second category of property is the Flight Center Property. The Flight Center Property measures approximately 86.93 acres and contains the Flight Center building as well as a tie-down area for aircraft. The Flight Center building is a three-story office building containing approximately 58,280 square feet of space and having a footprint of 17,000 square feet. For tax years 2000 and 2001, all of the Flight Center Property, except for 18,966 square feet of the building, was exempt. The nonexempt 18,966 square feet was leased in 2000 to Raytheon, which used the space as office space for aircraft management and aircraft charters; Kitty Hawk Café, which used the space for a restaurant and catering; Prime Meridian, which used the space as office space for an insurance agency; and Computer Dynamics, which used the space as office space for computer services. A portion of the Flight Center building was occupied in 1999 by Alumax Extrusion Company, but that tenancy expired in July 1999 and the space is now used by plaintiff for its office and incidental uses. All of the lessees occupying the nonexempt space in the Flight Center building (other than plaintiff) are private, for-profit commercial entities. Except according to the terms of the leases, plaintiff did not operate or maintain any of the nonexempt space in the Flight Center building other than the space it occupied.

The third category of disputed parcels is known as the Frank's

Auto Repair Property. This property contains three buildings, all of which are leased to a private, for-profit auto repair and sales company. The lessee has the exclusive right to use the property and uses it to operate a used car dealership and auto repair business. The lessee's use of the Frank's Auto Repair Property as an auto repair business and car dealership is not related to aviation and aeronautic operations, and, except as provided for in the lease, plaintiff did not maintain or operate the Frank's Auto Repair Property. In 2000, the property served as a revenue source for plaintiff.

The fourth category consists of a parcel known as the Antenna Property. The Antenna Property consists of 1.98 acres. All but 250 square feet of the property is vacant and has been designated by plaintiff for future development. For a lease term including tax year 2000, the 250-square-foot piece that is not vacant is leased to a private, for-profit entity that maintains a commercial cellular tower on the land. Due to the lease provisions negotiated by the former owner of the Antenna Property, all rent was paid in a single lump sum at the time the lease was signed. The operation of the commercial cellular tower is not related to aviation and aeronautical operations, and no such operations take place on the property. In 2000, plaintiff maintained all of the Antenna Property except the 250-square-foot leased area.

The fifth category of disputed parcels is referred to as the Wiesbrock Farm Property. It consists of 429.4 acres and is leased to Wiesbrock Turf Farm, Inc., a private, for-profit commercial entity that uses the property for sod farming and maintains related buildings and storage sheds thereon. The lessee of the Wiesbrock Farm Property has the exclusive right to use the property and uses it for commercial farming. No aviation or aeronautic activities occur on the Wiesbrock Farm Property, and, except as provided in the lease, plaintiff did not maintain or operate the property in 2000. In 2000, the property served as a revenue source for plaintiff.

The sixth, and final, category of disputed parcels comprises the Bork Farm Property. This property consists of 227.06 total acres. In 2000, the property was subject to a lease for use by a private, for-profit commercial entity for grain farming. The lessee of the Bork Farm Property has the exclusive right to use the property and uses it for commercial farming. Except as provided in the lease, plaintiff did not maintain or operate the Bork Farm Property, and no aviation or aeronautic activities occur on the property. In 2000, the Bork Farm Property served as a revenue source for plaintiff.

In 2000, all of the parcels within the Wiesbrock Farm Property and the Bork Farm Property were intended for inclusion in the yet-to-be-constructed Du Page County Research and Technology Park.

Plaintiff applied for a tax exemption under section 15—160 of the Code (35 ILCS 200/15—160 (West 2000)) for tax year 2000 for the above-described property, and defendants challenged the tax exemption. In lieu of a hearing, the parties presented the above-stipulated facts to the Department on cross-motions for summary judgment. On the basis of the stipulated facts and the parties' briefs and legal arguments, the Department determined that plaintiff is not entitled to an exemption under the Code. The Department reasoned that exemptions from the Code should be construed narrowly and that the exemption sought would impermissibly broaden the scope of section 15—160 of the Code to include land use bearing absolutely no relationship to aviation or aeronautics. It also rejected plaintiff's argument that, pursuant to an amendment to the Code, property leased to third parties should be exempt.

Plaintiff filed an action for administrative review with the circuit court of Du Page County on September 18, 2003, and, on June 30, 2004, the circuit court reversed the decision of the Department and held that plaintiff is entitled to an exemption under the Code. The court referred to the Act to supply the definition of "Airport Authority purpose" in the Code, and it determined that the amendment to the Act changed the definition of "Airport Authority purpose" to include the uses plaintiff sought to have exempted.

The Du Page County Board of Review and the interested taxing bodies filed their timely notice of appeal with this court on July 27, 2004, and Hamer and the Department filed their notice of appeal on the same day. The appeals (Nos. 2—04—0769 and 2—04—0770, respectively) were consolidated on August 9, 2004.

## II. DISCUSSION

### A. The Appropriate Standards of Review

■ We must first determine the appropriate standards of review for our analysis. In reviewing a final administrative decision under the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2000)), our role is to review the administrative decision, not the trial court's determination. *Richard's Tire Co. v. Zehnder*, 295 Ill. App. 3d 48, 56 (1998); see also 35 ILCS 200/8—40 (West 2000) (judicial review of Department decision governed by the Administrative Review Law). Plaintiff is silent as to the applicable standard of review, and defendants argue that the clearly erroneous standard of review applies here, because the Department's decision that the exemptions do not apply was an administrative ruling on a mixed question of fact and law. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998) (legal effect given a set of facts by administra-

tive agency receives clearly erroneous standard of appellate review). This is only partially correct.

The standard of review applicable to an agency's decision depends on whether the question presented on appeal is one of fact, of law, or of both. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001); see *City of Belvidere*, 181 Ill. 2d at 204-05. In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. *City of Belvidere*, 181 Ill. 2d at 204. Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. *City of Belvidere*, 181 Ill. 2d at 204. An administrative agency's factual determinations are against the manifest weight of the evidence where the opposite conclusion is clearly evident. *City of Belvidere*, 181 Ill. 2d at 204.

An administrative agency's rulings on a question of law, on the other hand, do not receive such deference on review. *City of Belvidere*, 181 Ill. 2d at 205. A court reviews such determinations on a *de novo* basis. *City of Belvidere*, 181 Ill. 2d at 205; see also *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369 (2002) (supreme court did not abandon *de novo* review in administrative review cases with announcement of clearly erroneous standard).

Finally, an agency determination of the legal effect of a given set of facts presents a mixed question of fact and law for which the clearly erroneous standard of review is appropriate. *City of Belvidere*, 181 Ill. 2d at 205. A mixed question of law and fact is one in which the historical facts are admitted or established and the rule of law undisputed. Consequently, the only issue is whether the facts satisfy the settled statutory standard, or whether the rule of law as applied to the established facts is or is not violated. *AFM Messenger Service*, 198 Ill. 2d at 391, quoting *Pullman-Standard v. Swing*, 345 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982); *Du Page County Board of Review v. Department of Revenue*, 339 Ill. App. 3d 230, 234 (2003). The clearly erroneous standard of review affords more deference to the agency than *de novo* review but less deference than manifest weight review. Therefore, applying the clearly erroneous standard to mixed questions yields some deference to administrative expertise. *City of Belvidere*, 181 Ill. 2d at 205, citing T. O'Neill & S. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512 (1995); see also *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1143-45 (2004) (applicable standard of review is reflection of disparate institutional

competencies of agencies, trial courts, and appellate courts). An agency decision will be deemed clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed. *AFM Messenger*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

In the current case, the parties stipulated to the relevant facts, and thus there is no question of fact presented for our review. The interpretation of the definition of "Airport Authority purposes" under section 15—160 of the Code (35 ILCS 200/15—160 (West 2000)) is a question of law to which *de novo* review applies (see *Richard's Tire Co.*, 295 Ill. App. 3d at 56). Finally, we review the Department's ultimate conclusion (the application of the law to the facts) under the clearly erroneous standard of review.

In arguing to apply the clearly erroneous standard to all issues in this appeal, defendants attempt to distinguish a recent Illinois Supreme Court case, *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273 (2004), which applied the *de novo* standard of review to a constitutional question after an agency decision. Defendants contrast the current case, which involves not a constitutional but a statutory question. However, both types of questions receive *de novo* review.

The decision in *Eden Retirement Center* does give us some pause, though, due to the following statement:

> "[The issue presented] depends solely on the application of the appropriate legal standard to the undisputed facts, which is a question of law. See *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271 (1996); [citations]. We review questions of law *de novo*. *City of Belvidere*, 181 Ill. 2d at 205 (and cases cited therein)." *Eden Retirement Center*, 213 Ill. 2d at 284.

Of course, as explained above, the supreme court has held that, where the facts are undisputed and the sole issue on appeal from an administrative ruling involves the application of the law to the undisputed facts, the clearly erroneous standard of review applies. *Carpetland U.S.A.*, 201 Ill. 2d at 369; *AFM Messenger*, 198 Ill. 2d at 391; *City of Belvidere*, 181 Ill. 2d at 205; *Du Page County Board*, 339 Ill. App. 3d at 234. Further, the supreme court has expressly noted that its announcement of the clearly erroneous standard for this type of administrative review "departed from its prior holdings that administrative rulings based on the application of law to undisputed facts would be reviewed *de novo*. See, *e.g.*, *Chicago Patrolmen's Ass'n*[, 171 Ill. 2d at 271]." *Carpetland U.S.A.*, 201 Ill. 2d at 368-69; see also *Du Page County Board*, 339 Ill. App. 3d at 233-34 (supreme court has

"rewritten the rules for reviewing administrative agencies' decisions and has overruled *** *Chicago Patrolmen's Ass'n*").

We think that, if the supreme court in *Eden Retirement Center* had intended to abandon the clearly erroneous standard it announced in *City of Belvidere*, it would have done so explicitly, and it would have done so without citing *City of Belvidere* approvingly in its discussion of the applicable standard of review. It also would have explicitly stated that it was returning to a rule of law from which it had previously noted its departure, and it would have explained that it was reinstating its previously abrogated decision in *Chicago Patrolmen's Ass'n*.

We find it more likely that the supreme court's application of the *de novo* standard of review in *Eden Retirement Center* was instead an acknowledgment that the court was addressing constitutional and statutory interpretation issues. Indeed, our reading of *Eden Retirement Center* indicates that the supreme court applied *de novo* review, not to the Department's application of facts to law, but instead to the question of whether the Department applied the appropriate legal standard in light of relevant constitutional principles. See *Eden Retirement Center*, 213 Ill. 2d at 284-93. Thus, the supreme court addressed issues of statutory and constitutional interpretation, to which it properly applied *de novo* review. As such, the supreme court's decision in *Eden Retirement Center* does not affect our conclusion that the *de novo* standard of review applies to our interpretation of the Code and the clearly erroneous standard applies to our review of the agency's application of the law to the settled facts. We interpret the above-quoted supreme court language to mean that only the determination of the applicable law receives *de novo* review.

Having laid out the applicable standards of review, we now move on to our consideration of the issues in this case. It is the well-settled rule of law in Illinois that all property is subject to taxation, unless exempt by statute, in conformity with the constitutional provisions relating thereto. *Eden Retirement Center*, 213 Ill. 2d at 285. Taxation is the rule—tax exemption is the exception. *Eden Retirement Center*, 213 Ill. 2d at 285.

There are two bases by which airport authority property may be entitled to an exemption under the Code: the property must be either "leased to another entity, which property use would be exempt from taxation under the Code if it were owned by the lessee entity," or "used for Airport Authority purposes." 35 ILCS 200/15—160 (West 2000). After laying out the applicable statutory language and supreme court precedent, we consider each point in turn.

### B. The Statutory Language

■ The overriding precept of statutory construction is for the

court to ascertain and give effect to the true intent of the legislature. *Giles v. General Motors Corp.*, 344 Ill. App. 3d 1191, 1196 (2003). Thus, our inquiry begins, as always, with the language of the statute. *Giles*, 344 Ill. App. 3d at 1196. Section 15—160 of the Code (35 ILCS 200/15—160 (West 2000)) states, in pertinent part:

> "All property belonging to any Airport Authority and used for Airport Authority purposes or leased to another entity, which property use would be exempt from taxation under this Code if it were owned by the lessee entity, is exempt."

Because the term "Airport Authority purposes" is not defined in the Code, plaintiff also directs us to the Act (70 ILCS 5/1 *et seq.* (West 2000)), which states, in pertinent part:

> "When used in this Act:
>
> * * *
>
> 'Airport' means any locality, either land or water, which is used or designed for the landing and taking off of aircraft, or for the location of runways, landing fields, airdromes, hangars, buildings, structures, airport roadways and other facilities.
>
> * * *
>
> 'Facilities' means and includes real estate and any and all forms of tangible and intangible personal property and services used or useful as an aid, or constituting an advantage or convenience to, the safe landing, taking off and navigation of aircraft, or the safe and efficient operation or maintenance of a public airport. In addition, for all airport authorities, 'facilities' means and includes real estate, tangible and intangible personal property, and services used or useful for commercial and recreational purposes.
>
> * * *
>
> 'Public Airport' means an airport owned by an airport authority or other public agency which is used or is intended for use by public, commercial and private aircraft and by persons owning, managing, operating or desiring to use, inspect or repair any such aircraft or to use any such airport for aeronautical purposes." 70 ILCS 5/1 (West 2000).

The Act defines its purposes as follows: "The establishment and continued maintenance and operation of safe, adequate and necessary public airports and public airport facilities within the State of Illinois and the creation of airport authorities having powers necessary or desirable for the establishment and continued maintenance and operation of such airports and facilities are declared and determined to be in the public interest, and such powers and the corporate purposes and functions of such authorities, as herein stated, are declared to be public and governmental in nature and essential to the public interest." 70 ILCS 5/7 (West 2000).

## C. The *Harrisburg II* Case

Though they disagree as to the import of the case, both sides direct us to the supreme court's decision in *Harrisburg-Raleigh Airport Authority v. Department of Revenue*, 126 Ill. 2d 326 (1989) (hereinafter *Harrisburg II*). It is fundamental to our judicial system that once our supreme court declares the law on any point, its decision is binding on all Illinois courts, and we cannot refuse to follow it, because we have no authority to overrule or modify supreme court decisions. *Robinson v. Johnson*, 346 Ill. App. 3d 895, 907 (2003). Therefore, we must determine if *Harrisburg II* is controlling on the question of what airport authority property is exempt under section 15—160 of the Code.

### 1. *Harrisburg II*'s Antecedent Appellate Cases

In *Harrisburg II*, the supreme court consolidated appeals from two appellate court cases raising the issue of whether certain real estate leased to private individuals by an airport authority was exempt from taxation, as property belonging to an airport authority and "used for Airport Authority purposes" under the applicable section of the Code in force at the time. *Harrisburg II*, 126 Ill. 2d at 329. The Code provided for tax-exempt status "for '[a]ll property of every kind belonging to any Airport Authority and used for Airport Authority purposes.' " *Harrisburg II*, 126 Ill. 2d at 331, quoting Ill. Rev. Stat. 1985, ch. 120, par. 500.20; *cf.* 35 ILCS 200/15—160 (West 2000) ("[a]ll property belonging to any Airport Authority and used for Airport Authority purposes or leased to another entity, which property use would be exempt from taxation under this Code if it were owned by the lessee entity, is exempt").

The first appellate court case antecedent to *Harrisburg II* was *Harrisburg-Raleigh Airport Authority v. Department of Revenue*, 163 Ill. App. 3d 253 (1987) (hereinafter *Harrisburg I*). There, the Department appealed a circuit court's reversal of the Department's denial of tax-exempt status to certain property owned by the Harrisburg-Raleigh Airport Authority (hereinafter HRAA). *Harrisburg I*, 163 Ill. App. 3d at 253. The HRAA applied for administrative review in the circuit court after the Department denied tax-exempt status to certain hangars on HRAA property. *Harrisburg I*, 163 Ill. App. 3d at 254. The hangars in question were available for rent to the public for the storage of aircraft on a first-come, first-served basis, and the HRAA maintained and provided electricity to the hangars. *Harrisburg I*, 163 Ill. App. 3d at 254.

The appellate court affirmed the trial court and reversed the Department, and it held that the hangars should be exempt because

the hangars constituted an "Airport Authority purpose" under the provision of the Code then in place providing an exemption to " '[a]ll property of every kind belonging to any Airport Authority and used for Airport Authority purposes.' " *Harrisburg I*, 163 Ill. App. 3d at 254, quoting Ill. Rev. Stat. 1985, ch. 120, par. 500.20. The court reasoned that "one of the purposes of an airport authority [under the Act (Ill. Rev. Stat. 1985, ch. 15½, par. 68.1 *et seq.*)] is to maintain an airport for the use of private aircraft and their owners." *Harrisburg I*, 163 Ill. App. 3d at 255. The court further reasoned that the fact that the HRAA charged rent for the hangars did not change its conclusion, because airport authorities were authorized to collect such rental fees for the use of airport facilities. *Harrisburg I*, 163 Ill. App. 3d at 255. The court rejected the Department's argument that, because the hangars were rented to private parties for private purposes, they were not used for airport authority purposes, because, the court said, the hangar use and rental was directly connected to the HRAA's purpose as defined by the Act.

The second appellate court case antecedent to *Harrisburg II* was *Fox Valley Airport Authority v. Department of Revenue*, 164 Ill. App. 3d 415 (1987). There, the Department appealed a circuit court's reversal of the Department's denial of tax exemptions for eight parcels owned by the Fox Valley Airport Authority (hereinafter FVAA). Six of the parcels were leased or rented to private parties either as hangars or as storage or maintenance facilities for aircraft, one of the parcels was rented to a private party and improved by a residence, and one of the parcels was leased to a private party and improved by a farmhouse and three outbuildings. *Fox Valley*, 164 Ill. App. 3d at 417.

Just as in *Harrisburg I*, the appellate court in *Fox Valley* first quoted the section of the Code allowing an exemption for airport authority property used for "Airport Authority purposes," then resorted to the Act to define what purposes could be exempt. *Fox Valley*, 164 Ill. App. 3d at 418-19. The appellate court held that, since the Act defined the purpose of airport authorities to include maintenance and operation of private aircraft, the property leased to private entities but used for aircraft storage and maintenance was exempt. *Fox Valley*, 164 Ill. App. 3d at 419. As for the parcels leased to private parties for farming and residential purposes, the appellate court held that no exemption should be allowed, because the farming and residential uses were not exempt, and "where property is used for both exempt and nonexempt purposes, a tax should be assessed against the property devoted to nonexempt uses." *Fox Valley*, 164 Ill. App. 3d at 419.

2. The Supreme Court's Decision in *Harrisburg II*

The supreme court consolidated *Fox Valley* and *Harrisburg I* in its

disposition of *Harrisburg II*. It affirmed the rulings of the appellate courts and held that the leasing of hangars and storage to private entities was tax exempt. *Harrisburg II*, 126 Ill. 2d at 333-34, 342. The supreme court articulated the issue on appeal, just as the two appellate courts had, in saying that "the critical question is whether the hangars are being used for 'Airport Authority purposes' [under the Code]." *Harrisburg II*, 126 Ill. 2d at 331. The court began by noting that "statutes exempting property from taxation are to be strictly construed in favor of taxation." *Harrisburg II*, 126 Ill. 2d at 331. Both sides on appeal pointed to section 7 of the Act, which defined the purpose of the Act as follows:

" 'The establishment and continued maintenance and operation of safe, adequate and necessary public airports and public airport facilities \*\*\* and the creation of airport authorities having powers necessary or desirable for the establishment and continued maintenance and operation of such airports and facilities are declared and determined to be in the public interest, and such powers and the corporate purposes and functions of such authorities, as herein stated, are declared to be public and governmental in nature and essential to the public interest.' " *Harrisburg II*, 126 Ill. 2d at 332, quoting Ill. Rev. Stat. 1985, ch. 15¹/₂, par. 68.7.

The supreme court quoted two more definitions from the Act before addressing the parties' arguments. First, it quoted the Act's definition of the term "Airport" as " 'any locality \*\*\* used or designed for the landing and taking off of aircraft, or for the location of \*\*\* hangars, buildings, structures, \*\*\* and other facilities.' " *Harrisburg II*, 126 Ill. 2d at 333, quoting Ill. Rev. Stat. 1985, ch. 15¹/₂, par. 68.1. Second, it quoted the Act's definition of a "Public Airport" as "an airport owned by an airport authority 'which is used or is intended for use by public, commercial and private aircraft and by persons owning, managing, operating or desiring to use, inspect or repair any such aircraft or to use any such airport for aeronautical purposes.' " *Harrisburg II*, 126 Ill. 2d at 333, quoting Ill. Rev. Stat. 1985, ch. 15¹/₂, par. 68.1.

After quoting the above statutory provision (just as the antecedent appellate courts had), the supreme court addressed the HRAA's argument that, because the term "Airport" included hangars, and because the term "Public Airport" contemplated use by private aircraft, it followed that public airports included, among other things, hangars used to store private aircraft. *Harrisburg II*, 126 Ill. 2d at 333. The supreme court found this syllogism to be "not perfect," but it nonetheless held that the private leases of hangars should be tax exempt as an "Airport Authority purpose" because the "General Assembly's inclusion of a

separate exemption for airport-authority uses suggests that this exemption is to be construed at least broadly enough to encompass private uses of airport-authority property which bear a real and substantial relation to the authority's statutory purpose of maintaining a public airport." *Harrisburg II*, 126 Ill. 2d at 336. In so holding, the court noted that the facts of the case "strongly support[ed] the conclusion that [the hangars] serve[d] a public airport's statutory function as a terminus for private, as well as public and commercial, aircraft." *Harrisburg II*, 126 Ill. 2d at 335.

As for the remaining two parcels from the *Fox Valley* case, the supreme court held that property primarily used for nonexempt purposes (there, for farming and as a residence) would not be exempt even if the property were being concurrently used for an arguably exempt purpose (there, as vacant land held for later airport expansion). *Harrisburg II*, 126 Ill. 2d at 342-43. The supreme court stated that it "think[s] it implicit in the phrase 'and used for Airport Authority purposes' that the property's current, primary use be airport related" and that "an airport authority [cannot] use its property for purposes unrelated to aviation without paying taxes." *Harrisburg II*, 126 Ill. 2d at 344.

Thus, after reading *Harrisburg II* in the context of its antecedent appellate court cases, it would seem that airport authority property leased to private entities may be tax exempt under the Code as fulfilling an "Airport Authority purpose" where the property's current, primary use (*Harrisburg II*, 126 Ill. 2d at 344) bears a real and substantial relation to the authority's statutory purpose of maintaining a public airport (*Harrisburg II*, 126 Ill. 2d at 344), which is to serve as a terminus for private, as well as public and commercial, aircraft (*Harrisburg II*, 126 Ill. 2d at 335), but that it may not be tax exempt where it is used for purposes unrelated to aviation (*Harrisburg II*, 126 Ill. 2d at 344).

After *Harrisburg II* was issued, the legislature amended both the Code and the Act. The parties disagree as to whether, and to what extent, the amendments altered or overruled the holding in *Harrisburg II*. We consider the amendment to the Code first, and we consider the amendment to the Act later, as it becomes relevant to our discussion of the definition of the phrase "Airport Authority purpose" in the Code (as part of the second possible basis for exemption).

## D. Interpretation of the Code as Amended

In 1990, the legislature amended section 15—160 of the Code by enacting Public Act 86—219 (Pub. Act 86—219, eff. January 1, 1990), which altered the Code's airport authority exemption provision as follows:

"All property [phrase 'of every kind' omitted here by amendment] belonging to any Airport Authority and used for Airport Authority purposes *or leased to another entity, which property use would be exempt from taxation under this Code if it were owned by the lessee entity, is exempt.*" 35 ILCS 200/15—160 (West 2000) (emphasis added to show addition after Public Act 86—219).

Where terms used in a statute have acquired a settled meaning in judicial construction, the legislature will be presumed to know and adopt that construction unless it clearly indicates otherwise. *Compton v. Ubilluz*, 351 Ill. App. 3d 223, 232 (2004). Here, we do not believe that the amendment to the Code evinces a clear intent on the part of the legislature to overrule *Harrisburg II*'s holding that private leases that fulfill an airport purpose may be exempt under the Code. While defendants argue that the use of the disjunctive "or" and then the articulation of a limited exemption for leases may indicate that property leased to third parties is to be considered separate from property serving an airport authority purpose, such an interpretation is far from absolute. We find it more likely that the legislature's language contemplates that *"all* property belonging to an Airport Authority" (emphasis added) (35 ILCS 15—160 (West 2000)), including leased property, may be exempt, *as well as* any leased property that would be exempt if it were owned by the lessee. Under this construction, the additional language ("or leased ***, which property") simply adds an additional exemption to the airport purpose exemption previously present in the Code.

Though it is true that, in interpreting the Code, we are to construe its passages strictly in favor of taxation (*Swank v. Department of Revenue*, 336 Ill. App. 3d 851, 855 (2003)), we note that the supreme court in *Harrisburg II* acknowledged this maxim before stating:

"The inclusion of a separate and broadly written exemption for airport-authority uses suggests that such uses, while they must be consistent with the maintenance of a 'public airport,' need not be exclusively 'public' ***." *Harrisburg II*, 126 Ill. 2d at 334-35.

The new statutory language does not clearly alter the "broadly written exemption" upon which the supreme court based its conclusion that privately leased property could qualify for an exemption so long as its use otherwise met the definition of "Airport Authority purposes" under the Code.

Defendants argue that the language of section 7 of the Act, which describes the purpose of the Act in terms of "maintaining and operating" airport facilities, dictates that leased property cannot meet the definition of airport authority purposes in the Code. However, the supreme court did not resort to the Act to determine whether private

airport-related uses could be exempt. It instead based its conclusion on the "broadly written" exemption in the Code.[1] Further, the "maintaining and operating" language defendants reference was present in the Act at the time the supreme court decided in *Harrisburg II* that property leased to third parties could qualify for the exemption.

We find further support for our conclusion that the amendment to the Code was not intended to alter the law as announced in *Harrisburg II* in the amendment's legislative history, which plaintiff provides us. In summarizing the bill, Representative Woolard stated:

> "The Bill specifically addresses the issue of [a health department] located on Airport Authority Property ***. With the language of the [Code] as it is now stated, we would not be able to exempt them from taxing. As the Bill is presented, it would accommodate a tax-exempt entity *** to be rendered *** tax-exempt status on the Airport Authority Property." 86th Ill. Gen. Assem., House Proceedings, May 17, 1989, at 165-66 (statements of Representative Woolard).

This material demonstrates that our reading of the amendment is in harmony with the purpose of the amendment as stated by the legislators who proposed it.

■ Given the foregoing considerations, we conclude that there are two ways in which airport authority property may qualify for a tax exemption under section 15—160 of the Code. First, the property may be leased to a third party, where the use of the property by the third party would otherwise be exempt under the Code if the lessee owned the property. Second, the property may be used for an airport authority purpose (as that phrase is defined below). It does not matter whether the property is leased under this second prong. We examine both bases for exemption here.

E. First Possible Basis for Exemption: Exempt Leased Property

The first possible basis for exemption occurs when airport authority property is "leased to another entity, which property use would be exempt from taxation under this Code if it were owned by the lessee entity." 35 ILCS 200/15—160 (West 2000). However, we reject applica-

---

[1] In other words, the supreme court concluded that private uses could be exempt based on the language of the Code. However, when it later announced the full definition of "Airport Authority purposes," it directed that the phrase is fully defined by the Act. This point is discussed more fully below. Therefore, according to *Harrisburg II*, the Code tells us that private uses may be exempt, but the Act provides the remainder of the definition of the phrase "Airport Authority purposes."

tion of this basis with the plain language of section 15—160. In order to qualify for the lease exemption, the use to which the lessee puts the property must be one that, *if the lessee owned the property*, would be exempt under the Code. None of the third-party lessees' uses would be exempt under any provision of the Code other than section 15—160. Because none of the third-party lessees are airport authorities, even assuming that the current uses of the parcels constitute "Airport Authority purposes," the third-party lessees would not qualify for an exemption under the Code. The disputed property cannot qualify for the first basis for exemption.

### F. Second Possible Basis for Exemption: Airport Authority Purposes

Plaintiff asserts that, notwithstanding the fact that the property here may not qualify for an exemption under the second clause of section 15—160 of the Code, it nonetheless does qualify under the clause exempting "[a]ll property belonging to any Airport Authority and used for Airport Authority purposes."

### 1. The Applicability of *Harrisburg II* in defining "Airport Authority Purposes"

As noted above, although *Harrisburg II* interpreted the phrase "Airport Authority purposes," it did so before the legislature amended the Code and the Act. The amendment to the Code is considered above, and it leads us to conclude that property can at once be leased to a third party and fulfill an airport authority's statutory purpose. However, the amendment to the Code does not provide any further definition of "Airport Authority purposes" under the Code. As explained more fully below, the supreme court has directed that, where the Code fails to provide guidance to define the phrase "Airport Authority purposes," we must examine the Act in order to find our definition.

■ In 1992, the legislature amended the Act by enacting Public Act 87—854 (Pub. Act 87—854, eff. May 8, 1992). Under the Act's new language, the term "facilities" is defined as follows:

> " 'Facilities' means and includes real estate and any and all forms of tangible and intangible personal property and services used or useful as an aid, or constituting an advantage or convenience to, the safe landing, taking off and navigation of aircraft, or the safe and efficient operation or maintenance of a public airport. *In addition, for all airport authorities, 'facilities' means and includes real estate, tangible and intangible personal property, and services used or useful for commercial and recreational purposes.*" 70 ILCS 5/1 (West 2000) (emphasis added to show new language after Public Act 87—854).

Defendants offer five arguments to support their contention that the amendment to the Act should not affect our analysis. First, they assert that *Harrisburg II* did not rely on the Act and thus that any amendment to the Act is irrelevant to our analysis. However, because the supreme court in *Harrisburg II* affirmed the interpretation of the two antecedent appellate court cases relying on the definitions contained in the Act, and because it referred to a "statutory" airport purpose, we must infer that it relied on the Act to reach its definition of "Airport Authority purposes" under the Code. In so inferring, we acknowledge that the supreme court at least partially based its holding on "other considerations" beyond the parties' arguments under the Act. See *Harrisburg II*, 126 Ill. 2d at 333-35. However, we find that the supreme court's reference to the "statutory" airport purpose is inescapably the basis for its definition. See *Harrisburg II*, 126 Ill. 2d at 335, 336. Our reading of the case indicates that the court may have disagreed with the parties' arguments based on the Act, but it nevertheless relied on the Act to help supply the definition of "Airport Authority purposes." Defendants are correct in their assertion that, in determining that resort to the Act was necessary to define "Airport Authority purposes" and in determining that leases can qualify for the exemption, the supreme court relied on language from the Code that has not changed.[2] Nevertheless, under *Harrisburg II*, we must consider the Act in interpreting the phrase "Airport Authority purposes" in the Code.[3]

Second, defendants argue that the Act should not be considered at

---

[2]As discussed above, the Code has also been amended since the supreme court decided *Harrisburg II*. However, that amendment did not alter the "Airport Authority purposes" language from the Code relied on by the supreme court and thus has no effect on the supreme court's conclusion that resort to the Act is necessary to define the phrase. Though its ultimate interpretation was based on a now-altered version of the Act, *Harrisburg II* still instructs us that, where the Code offers no direction, the proper methodology to follow in interpreting the definition of "Airport Authority purposes" is to refer to the definitions contained in the Act.

[3]Our reliance on *Harrisburg II* and the Act on this point is not inconsistent with our reliance above on the language of the Code. *Harrisburg II* indicates that courts should rely on the Act when the Code itself offers no interpretive guidance. We held above that the Code itself (as amended) did supply guidance for our construction by indicating that a lease may be considered an "Airport Authority purpose." Thus, though we may use the language of the Code to include leases in the definition of "Airport Authority purposes," we must still resort to the Act to supply the remainder of the definition of that phrase.

all in our construction of the Code because it specifies what an airport has the power to do, not which airport authority land is exempt from taxation. However, the supreme court, as noted, has indicated that the Act is to be used in interpreting "Airport Authority purposes" under the Code. Thus, though the Act may concern an issue inapposite here (plaintiff's power to do certain acts), we must rely on it to inform our construction of the term "Airport Authority purposes" as used in the Code. That said, defendants' point is well taken. While their argument does not prevent us from considering the Act (as amended) in interpreting the Code, it does factor into the determination, as discussed below, of whether the amendment to the Act was intended to overrule *Harrisburg II*.

Third, defendants argue that *Harrisburg II* should stand as the law defining "Airport Authority purposes" under the Code because, even though the legislature amended the Act after *Harrisburg II* was issued, it did not expressly overrule *Harrisburg II*. However, the language of the Act *Harrisburg II* relied upon has nonetheless changed, and, because we are charged with interpreting the current law, we may not rely on *Harrisburg II* as a binding interpretation of the Code if the legislature intended to alter the holding with its amendment. That said, we do note that, at the time it was published, *Harrisburg II* established the law with respect to the interpretation of "Airport Authority purposes" under the Code; this observation informs our construction of the Code (and of the legislature's intent in amending the Act). See *Hoffer v. School District U-46*, 273 Ill. App. 3d 49, 56 (1995) ("a statute should not be construed to effect a change in the settled law of the State unless its terms clearly require such a construction").

We may address defendants' fourth and fifth arguments together. Defendants argue, fourth, that resorting to the Act impermissibly bootstraps language from the Act into the Code, and that any definitions should come from the Code itself. Fifth, defendants argue that, absent a definition of "Airport Authority purposes" in the Code, the phrase must be given its common and ordinary meaning. See *Armour Pharmaceutical Co. v. Department of Revenue*, 321 Ill. App. 3d 662, 666 (2001) ("[w]here a statutory term is undefined, that term must be given its ordinary and properly understood meaning"). However, as explained above, the supreme court has indicated that the phrase is to be defined by reference to the Act.

We acknowledge the Department's rationale that the methodology employed in *Harrisburg II* does not require that we refer to the Act to glean our definition of "Airport Authority purposes" because, as the Department put it, "the particular uses to which the court applied

that methodology, such as aircraft hangars and aircraft storage facilities, bore a specifically identifiable relationship to aviation or aeronautics." We cannot agree with the circular logic that statement employs. To state that the Act should be consulted only where the questioned uses bear an identifiable relationship to aviation or aeronautics presupposes a definition of "Airport Authority purposes" without first finding any authority for that definition. The supreme court found no definition of "Airport Authority purposes" in the Code and thus resorted to the Act, and we must do the same.

Because the supreme court has directed that the Act is to be consulted in defining "Airport Authority purposes" under the Code, and because the legislature has amended the definition of the word "facilities," upon which the supreme court partially relied in defining "Airport Authority purposes" itself (see *Harrisburg II*, 126 Ill. 2d at 333 (relying on definitions in the Act that use the word "facilities")), we must consider the effect of the amendment on the definition of "Airport Authority purposes." However, because *Harrisburg II* relied on language from the Act that was different from that we see here, we find guidance from that case only to the extent that it directs us to resort to the Act for our interpretation of the Code. We again observe that, though its holding was predicated on a previous version of the Act, the supreme court did establish the preamendment legal definition of "Airport Authority purposes" under the Code. Thus, our next task becomes determining whether the legislature's amendment of the Act was intended to change the law as articulated in *Harrisburg II*.

### 2. Definition of the Phrase "Airport Authority Purposes"

Aside from the language that indicates that leases may be considered "Airport Authority purposes," the definition of the phrase does not appear in the Code. Therefore, pursuant to *Harrisburg II*, we must resort to the Act for our definition. The relevant provisions of the Act are excerpted above. Plaintiff notes that the Act's stated purpose includes "establishment and continued maintenance and operation of *** public airports and public airport facilities" (70 ILCS 5/7 (West 2000)), and the Act's amended definition of "facilities" includes "real estate *** and services used or useful for commercial and recreational purposes" (70 ILCS 5/1 (West 2000)). Thus, plaintiff argues, the phrase "Airport Authority purposes" must now include commercial and recreational uses. Defendants posit myriad arguments to the contrary.

Before moving to defendants' more meritorious contentions, we first quickly dispose of defendants' argument that allowing an exemption for privately used property would be unconstitutional: article IX, section 6, of the Illinois Constitution permits the legislature to exempt

from taxation the property of local governments (such as plaintiff). Ill. Const. 1970, art. IX, § 6.

Defendants offer several more arguments that we find to be more persuasive. They note that statutes allowing tax exemptions are to be narrowly and strictly construed in favor of taxation. *Swank*, 336 Ill. App. 3d at 855. Thus, though we are resorting to the Act to interpret a provision of the Code, we must nonetheless interpret the Act here consistently with the Code, and we must strictly construe the provisions of the Act in favor of taxation.

They also note that "[w]here terms used in a statute have acquired a settled meaning in judicial construction, the legislature will be presumed to know and adopt that construction unless it clearly indicates otherwise." *Compton*, 351 Ill. App. 3d at 232. Thus, because *Harrisburg II* settled the meaning of the phrase "Airport Authority purposes" in the Code, we must presume that the legislature has acquiesced in that definition absent a clear indication to the contrary. Defendants argue that, if the legislature intended to make a clear statement that it wanted to expand the exemption from its definition as articulated in *Harrisburg II*, it would have amended the Code (and not the Act), it would have expressly referenced *Harrisburg II* or the exemption in either the text or the legislative history of the amendment to the Act, or it would have expressly incorporated the amended definition from the Act into the Code (see 35 ILCS 200/15—150 (West 2002) (amendment to Code specifically referencing Downstate Forest Preserve District Act to define tax-exempt property)).

Plaintiff rebuts this argument by noting that the legislature knew, at the time it amended the Act, that the supreme court had ruled that the Act was to be used to interpret the airport authority exemption in the Code, and, thus, the legislature need not have amended the Code, because it knew amendment to the Act would suffice to change the definition as articulated in *Harrisburg II*. See *Burrell v. Southern Truss*, 176 Ill. 2d 171, 176 (1997) (when statutes are enacted after judicial opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law). However, as noted above, a legislative amendment must clearly state that it is intended to reverse a settled judicial construction of a statute in order for such a reversal to be read into the amendment. We think the amendment to the definition of the term "facilities" in the Act insufficiently clear (and too far attenuated) to evince a legislative intent to change the holding in *Harrisburg II*.

We find support for our conclusion from other points raised by defendants. First, defendants observe that the purpose of the Act is to declare the powers of airport authorities, a topic wholly separated

from the purpose of the Code, which is to administer taxes. This consideration bolsters our view that the amendment to the Act is too far attenuated to have been meant to alter the settled interpretation of the Code.

Defendants further point out that the Act seems to contemplate that, though airport authorities may operate nonaviation facilities, their primary purpose still relates to aviation and aeronautics. For example, the Act defines "public interest" as "the protection \*\*\* of the general welfare and of public health and safety and public necessity and convenience *in respect to aeronautics.*" (Emphasis added.) 70 ILCS 5/1 (West 2000).

The legislative history the parties provide also favors our interpretation that the amendment was not intended to affect the settled law regarding airport authorities' tax exemptions. In arguing against the amendment, Representative Wendund complained that the Act would let "airport authorities who levy property taxes \*\*\* raise property taxes to build golf courses." 87th Ill. Gen. Assem., House Proceedings, January 9, 1992, at 14 (statements of Representative Wendund). Representative Kulas countered that the bill would "allow airport authorities to use non aviation land for commercial, farming and recreational purposes in order to not increase property taxes [because they could draw revenue elsewhere]." 87th Ill. Gen. Assem., House Proceedings, January 9, 1992, at 16 (statements of Representative Kulas). Another summary of the bill, by Representative Giorgi, described the bill as "insert[ing] a provision to clarify land use and facilities of airport or authorities \*\*\* for purposes other than direct aviation use. There are a number of airports in Illinois \*\*\* that have land they could use for other purposes \*\*\*. This clears up the language so that they can do this \*\*\*." 87th Gen. Assem., House Proceedings, May 6, 1992, at 28 (statements of Representative Giorgi). Defendants point out that, in all the discussion of the amendment, there was no mention of *Harrisburg II* or any property tax exemption. Plaintiff argues that legislators did refer to property tax in the above-quoted comments, but it fails to note that the legislators' references to tax were made in the context only of reducing airport authorities' dependence on taxes as a mode of revenue.

Finally, it is well settled that, where two constructions of a statute are proposed, the court will avoid the one that yields absurd results. *Lee County Board of Review v. Property Tax Appeal Board*, 278 Ill. App. 3d 711, 726 (1996). Declaring all commercial and recreational uses, along with airport-related uses, to be tax exempt would not only create a substantial tax loophole to be exploited by private lessees, but it would also render virtually meaningless the limitation in the Code requiring that exempt land be used for airport authority purposes.

Plaintiff argues that an airport authority's use of property need not be exclusively public in order to be eligible for exemption. While that is undoubtedly true (see 70 ILCS 5/1 (West 2000) (public airport includes private and commercial aircraft uses)), it does not address the issue here—what uses, be they public or private, constitute "Airport Authority purposes" under the Code. See *Harrisburg II*, 126 Ill. 2d at 333-35 (eschewing public-private distinction in formulating its definition of the phrase "Airport Authority purposes"). Likewise, plaintiff's analogies to statutes in which the legislature specifically prevented exemptions for property used with a view toward profit are inapposite. See 35 ILCS 200/15—35, 15—40, 15—65 (West 2002).

■ Finally, because plaintiff also asserts that several of the parcels, though used now primarily for other purposes, are being held for future airport expansion, we note that there is no indication, by amendment or otherwise, that the legislature had or has any intention to overrule the supreme court's declaration in *Harrisburg II* that only the current, primary use of airport authority property should be considered in determining whether the section 15—160 exemption applies.

Therefore, after considering the language of the Code and the Act (as amended), we conclude that the legislature did not intend to change the definition of "Airport Authority purposes" from that articulated in *Harrisburg II*. We will apply that definition, as it is laid out above.

### 3. Application of the Definition of "Airport Authority Purposes" to the Facts of This Case

Now that we have determined the applicable rule of law, we are left only with the question of whether the undisputed facts in this case meet the legal standard for "Airport Authority purposes" as we have defined it. As explained above, this question presents a mixed issue of fact and law to which the clearly erroneous standard of review applies. *AFM Messenger*, 198 Ill. 2d at 391 ("a mixed question is one 'in which the historical facts are *** established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard ***.' [Citations.]").[4]

Applying the legal definition from above, it is clear that the disputed property does not meet the standard for "Airport Authority purposes" under the Code.

---

[4]The application of clearly erroneous review, of course, assumes that the administrative agency applied the proper legal standard; an agency would hardly be accorded deference in applying the incorrect law to the facts of a case. However, our reading of the Department's decision convinces us that it applied the law essentially as we have articulated it here, albeit for different reasons.

For the foregoing reasons, we reverse the order of the circuit court of Du Page County ruling that plaintiff is entitled to a tax exemption under section 15—160 of the Code for all the disputed property.

Reversed.

HUTCHINSON and GROMETER, JJ., concur.